NOTICE

*The text of this opinion can be corrected before the opinion is published in the* <u>*Pacific Reporter*</u>. *Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

|  |  |
|---|---|
| MICHAEL D. LOGAN JR.,<br><br>    Appellant,<br><br>    v.<br><br>STATE OF ALASKA,<br><br>    Appellee. | Court of Appeals No. A-13610<br>Trial Court No. 2KB-18-00407 CR<br><br><br>O P I N I O N<br><br><br>No. 2781 — June 14, 2024 |

Appeal from the Superior Court, Second Judicial District, Kotzebue, Paul A. Roetman, Judge.

Appearances: Michael Horowitz, Law Office of Michael Horowitz, Kingsley, Michigan, under contract with the Public Defender Agency, and Samantha Cherot, Public Defender, Anchorage, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge HARBISON.

Michael D. Logan Jr. was convicted, following a jury trial, of second-degree sexual assault for digitally penetrating an incapacitated woman.[1] Logan now appeals his conviction, raising two claims of error.

First, Logan argues that the superior court erred by denying his motion to dismiss the indictment. He claims that reversal is required because the prosecutor erroneously instructed the grand jury that, as a matter of Alaska law, a person who is asleep is considered "incapacitated." Second, Logan argues that the superior court erroneously prohibited him from calling the complaining witness during the defense case in order to present evidence of her bias in favor of the State.

For the reasons explained in this opinion, we find no reversible error and affirm Logan's conviction.

*Factual and procedural background*

One night in May 2018, Michael Logan, K.S., and their mutual friend Shasta Nelson were at a small gathering where people were drinking alcohol, smoking marijuana and tobacco, and using cocaine. Later on, Logan, K.S., and Nelson went together to Nelson's house. At some point, Nelson left the house, and Logan and K.S. each fell asleep, fully clothed, on Nelson's bed.

According to K.S., the next thing she remembered after "pass[ing] out" on the bed was "[waking] up with Michael Logan's fingers in [her] vagina." K.S. immediately pulled his hand out of her pants and told him to stop, which he did. She then left the house and went to the hospital, where she reported the sexual assault.

---

[1] Former AS 11.41.420(a)(3)(B) (2018). The jury also found Logan guilty of third-degree sexual assault for the same conduct (under former AS 11.41.425(a)(1)(B) (2018)), and the two counts merged.

When the police arrived at Nelson's house, Logan was still in bed. Logan agreed to speak to the officer, and he admitted to digitally penetrating K.S. while she was sleeping. A DNA swab indicated the presence of K.S.'s DNA on both of Logan's hands, and an expert in the field of DNA analysis testified that this was consistent with DNA that came from vaginal or other biological fluids.

Logan was subsequently indicted for second- and third-degree sexual assault for digitally penetrating and engaging in sexual contact with K.S. while knowing she was incapacitated.[2]

Before trial, Logan's attorney moved to dismiss the indictment, arguing that the prosecutor had improperly instructed the grand jury that, as a matter of law, a person who is asleep is considered incapacitated for purposes of these two offenses. Logan's attorney argued that the grand jury was required to make its own factual finding as to whether K.S. was incapacitated, and that the prosecutor's instructions improperly directed this finding.

The superior court agreed that it was error for the prosecutor to have instructed the jury that a person who is asleep should be considered incapacitated as a matter of law, but it found that the error had not prejudiced Logan's defense. The court denied the motion, concluding that "[t]he error did not appreciably affect the grand jury's deliberations because there was sufficient evidence presented to return a true bill." The court explained that the evidence presented to the grand jury established that "when Logan inserted his finger into K.S., he knew she was actually asleep and was not able to express her unwillingness to act (*i.e.*, incapacitated)."

---

[2]    Former AS 11.41.420(a)(3)(B) (2018) and former AS 11.41.425(a)(1)(B) (2018), respectively.

The case proceeded to trial, and K.S. testified on the first day. During cross-examination, Logan's attorney asked K.S. about her relationship with her then-boyfriend at the time of her interaction with Logan. Through the cross-examination, the attorney was able to establish that K.S.'s boyfriend was abusive, and the attorney later argued that this cast doubt on K.S.'s version of events. After K.S.'s testimony, the State called its remaining witnesses and then rested its case.

After the State rested, Logan's attorney initially told the superior court that Logan would be testifying and that he was the final witness. However, the attorney subsequently stated that he had a "last second headache" for the court and that he had "just subpoenaed" K.S. and a police officer. The attorney stated that he wanted to recall K.S. to question her about a pending felony charge against her because he had forgotten to question her about the pending charge during his cross-examination. The superior court ruled that the attorney had been given an opportunity to question K.S. during cross-examination and that the attorney would not be permitted to call K.S. to testify. Logan's attorney then called Logan as the only defense witness.

Logan testified that he believed that K.S. was awake when he digitally penetrated her. In particular, he testified, "I was thinking she was still awake, and I guess she wasn't awake, and she woke up and told me to stop." He stated that he then stopped.

The jury ultimately found Logan guilty of both charges, and the superior court merged the two counts into a single conviction for second-degree sexual assault. This appeal followed.

*The superior court did not err in denying Logan's motion to dismiss the indictment*

Logan was indicted for second- and third-degree sexual assault for digitally penetrating and engaging in sexual contact with K.S. while knowing she was incapacitated.[3] During the grand jury proceedings, the prosecutor gave the grand jury written instructions and provided an oral explanation of the instructions shortly before calling K.S. as a witness. Logan contends that the prosecutor erroneously instructed the grand jury that, as a matter of Alaska law, a person who is asleep is considered "incapacitated."

The written instructions provided by the prosecutor included the definition of "incapacitated" set out by AS 11.41.470(2): "A person is 'incapacitated' if the person is temporarily incapable of appraising the nature of the person's own conduct or physically unable to express unwillingness to act." The written instructions also included a copy of the use note for AS 11.41.470(2), which stated in relevant part that "*King v. State* . . . held that a victim, who had been sleeping at the time she was sexually penetrated, was incapacitated."

The prosecutor also provided additional oral instructions, telling the grand jury:

> A person is incapacitated if the person is temporarily incapable of appraising the nature of the person's own conduct or physically unable to express unwillingness to act. There's a court case called *Ragsdale v. State*, and that was based on *King v. State*, that held that if a victim is sleeping at the time that they're sexually penetrated, they're considered incapacitated.

---

[3] Former AS 11.41.420(a)(3)(B) (2018) and former AS 11.41.425(a)(1)(B) (2018), respectively.

After the witnesses had testified, but prior to the grand jury's deliberations, the prosecutor reminded the grand jury that Logan had admitted to digitally penetrating K.S. while she was sleeping, and then told the grand jury that "the law says that incapacitated means sleeping."

As we have explained, Logan's attorney filed a motion to dismiss the indictment prior to his trial, contending that the prosecutor's instructions to the grand jury mistakenly equated sleeping with incapacitation. The superior court denied the motion, finding that while the instruction was erroneous, the error was harmless.

On appeal, Logan contends that the superior court erred by denying his motion. The State responds that the instruction was proper and, alternatively, that the superior court correctly determined that any error was harmless under the circumstances of this case.

There is support in our case law for the view that a sleeping person is "incapacitated" for purposes of Alaska's sexual assault statutes. In *King v. State*, the defendant was convicted of sexual assault of a person who was "incapacitated" as defined by former AS 11.41.470(2).[4] Under the former statute, the State was required to prove *both* prongs of the "incapacitation" definition — *i.e.*, that the victim was (1) temporarily incapable of appraising the nature of their own conduct, and (2) physically unable to express unwillingness to act.[5] King claimed that evidence establishing that the complaining witness was sleeping when he initially penetrated her was insufficient to support the jury's verdict.[6]

---

[4] *King v. State*, 978 P.2d 1278, 1279 (Alaska App. 1999).

[5] Former AS 11.41.470(2) (Mar. 1997).

[6] *King*, 978 P.2d at 1279.

This Court rejected King's claim, concluding that evidence that the victim was asleep was sufficient to establish both that she was "incapable of understanding that she was engaged in sexual penetration," and that she had been "physically unable to express unwillingness to engage in sexual penetration."[7] We accordingly affirmed King's conviction.[8] But in doing so, we cautioned that the question of whether a sleeping person was incapacitated should be "answered by an examination of the evidence," rather than by relying on "generalities about the characteristics or capabilities of sleeping people."[9]

In July 1997, after the underlying incident in *King* had occurred, the legislature amended AS 11.41.470(2).[10] Under the amended statute (*i.e.*, the version that was in effect at the time of this case), the State must prove *either* that the victim was temporarily incapable of appraising the nature of their own conduct *or* that the victim was physically unable to express unwillingness to act.[11] Thus, evidence sufficient to support only one of the two prongs of "incapacitation" may now satisfy the State's burden of proving a victim was incapacitated. And, as we held in *King*, evidence that a victim is sleeping is generally sufficient for a jury to reasonably conclude that a victim is "temporarily incapable of appraising the nature of [their] own conduct."[12]

But there is an important difference between (1) an appellate court's holding that the evidence, when viewed in the light most favorable to upholding a jury's

[7]   *Id.* at 1280.

[8]   *Id.* at 1281.

[9]   *Id.* at 1280.

[10]   SLA 1997, ch. 63, § 7.

[11]   *See* AS 11.41.470(2).

[12]   *King*, 978 P.2d at 1280-81.

verdict, was legally sufficient, and (2) a prosecutor's use of a fact pattern from an appellate case to instruct a fact finder that those facts establish an element of an offense, or a legal term described in the definition of an offense, as a matter of law. Indeed, many other jurisdictions have disapproved of instructions that define legal terms by providing examples of fact patterns derived from appellate cases.[13]

Such instructions may be misleading or confusing to those not trained in the law. They also may suggest to fact finders that they need not carefully examine the evidence to determine whether the State has met its burden of proof. We disapprove of the prosecutor's remarks in this case, and we caution courts and practitioners to avoid such instructions in future cases.

However, we conclude that the prosecutor's improper remarks do not require dismissal of the indictment. Logan cites to *Konrad v. State* for the proposition that a prosecutor's erroneous instruction to a grand jury invalidates the indictment.[14] But Logan's reliance on *Konrad* is misplaced. In that case, we did not conclude that *all* instructional errors during a grand jury proceeding require dismissal of the indictment. Instead, we considered whether the particular misinstruction would have caused the grand jury to evaluate the evidence under an incorrect standard, and concluded that the possibility of this was "sufficiently great" under the facts in Konrad's case.[15] We do not reach such a conclusion in the present case.

In the present case, the instructions clearly conveyed to the grand jurors that they were required to determine whether K.S. was temporarily incapable of appraising

_____

[13]   *See, e.g.*, *Kirsch v. State*, 357 S.W.3d 645, 651 (Tex. Crim. App. 2012); *Marks v. State*, 864 N.E.2d 408, 411-12 (Ind. App. 2007); *State v. Dawley*, 34 P.3d 394, 397-98 (Ariz. App. 2001); *Commonwealth v. Plowman*, 548 N.E.2d 1278, 1280-81 (Mass. App. 1990).

[14]   *Konrad v. State*, 763 P.2d 1369, 1374-75 (Alaska App. 1988).

[15]   *Id.*

the nature of her conduct or physically unable to express a willingness to act. And as the superior court found, the evidence was sufficient to establish that K.S. was incapacitated and that Logan knew that she was incapacitated.[16] K.S. testified before the grand jury that when she fell asleep, she was alone on the bed. She later woke up to Logan's hand inside her vagina. She told the grand jury that when she awoke, she grabbed Logan's hand out of her vagina and started "freaking out." The grand jury also heard the testimony of a police officer who described Logan's interview with the police. The officer testified that Logan admitted that, while K.S. was asleep, he had tried to arouse her by digitally penetrating her vagina. Logan stated that K.S. then woke up, asked him what he was doing, and "told him no."

Under these circumstances, we conclude that the superior court did not err by denying the motion to dismiss the indictment.

*The superior court's error in prohibiting Logan's attorney from calling the complaining witness during his defense case was harmless beyond a reasonable doubt*

Logan's second argument is that the superior court erred when it did not allow him to call K.S. during his defense case so that he could impeach her with evidence of her pending felony case.

As we have explained, K.S. testified as a witness during the State's case, and Logan's attorney conducted a robust cross-examination of her, including questioning her about an ongoing abusive relationship she had with another man and suggesting that K.S. was afraid of this other man in order to cast doubt on the accuracy of K.S.'s

---

[16] *See Hurd v. State*, 22 P.3d 12, 20 (Alaska App. 2001) (holding that dismissal of the indictment was not required because, if the grand jurors had received the correct instructions, they undoubtedly would have found sufficient grounds to indict).

statements about the incident with Logan. The court did not limit the attorney's impeachment of K.S. in any way, and the attorney ultimately questioned K.S. a total of three times — after direct examination, after re-direct examination, and after questions from the jury.

The State also called a sexual assault nurse examiner and a police officer who were part of the sexual assault response team that initially investigated K.S.'s report. The nurse testified that K.S. had reported that she was digitally penetrated, and that the examination the nurse conducted was consistent with K.S.'s report. The police officer testified that K.S. reported to him that she woke up to Logan "with his hands down her pants" and his fingers in her vagina.

The State then rested its case, and Logan's attorney informed the court that Logan decided to testify. The attorney informed the court that Logan would be the only defense witness. The court recessed for a short break.

After the break, Logan's attorney announced that he had "just subpoenaed" K.S. and a Kotzebue police officer to testify "about the fact that [K.S.] is currently facing her own felony charge." The attorney explained that he had intended to ask K.S. about this pending case during her earlier testimony, but he mistakenly failed to do so. He also acknowledged that this was a "last second headache" for the court. The attorney stated, however, that he wanted to establish that K.S. was facing her own unspecified felony charge, which he argued was evidence of K.S.'s interest or bias in favor of the State.

The prosecutor confirmed K.S. had been charged with a felony in an unrelated case and that the State had extended an offer to her to resolve it. The prosecutor emphasized that the State was not requiring K.S. to testify against Logan as part of any plea agreement and that the charge against K.S. had been filed in April 2019 — about a year *after* the underlying incident that formed the basis for the charges in this case. Logan's attorney admitted that he was aware of K.S.'s pending charge prior to trial

but stated that he realized that morning, when he was practicing his closing statement, that he had not questioned K.S. about it during her earlier testimony.

The superior court denied the request, finding that the defense had waived the right to call K.S. by failing to "file any pretrial motion about it" and by failing to ask her about her pending felony charge during her previous testimony.

The State concedes that the superior court should not have relied on the failure to file a pretrial motion as a basis for denying the defense request to call K.S. This concession is well-taken.[17] Logan's attorney was not required to file a pretrial motion in order to question K.S. regarding her pending felony charge.

Furthermore, although Logan's attorney was given ample opportunity to question K.S. on the first day of trial, the attorney was entitled to call witnesses as part of his defense case.[18] He was also entitled to "broad latitude" in questioning a witness about potential bias.[19] Notably, Logan's attorney was not proposing to call K.S. merely to impeach her on matters to which she had previously testified. Rather, Logan's attorney was proposing to introduce new and different evidence of K.S.'s potential bias. Logan's attorney provided an offer of proof indicating the content of K.S.'s proposed testimony, and although he suggested that his request would be a "headache," no evidence in the record established that allowing Logan's attorney to call K.S. would

---

[17] *See Marks v. State*, 496 P.2d 66, 67-68 (Alaska 1972) (requiring an appellate court to independently assess the State's concession of error in a criminal case).

[18] *See Brandon v. Dep't of Corr.*, 865 P.2d 87, 90 (Alaska 1993) ("The right to call witnesses and present evidence is fundamental to a fair hearing and due process.").

[19] *Williams v. State*, 480 P.3d 95, 102 (Alaska App. 2021) (quoting *Stumpf v. State*, 749 P.2d 880, 901 (Alaska App. 1988)).

cause confusion or unreasonable delay.[20]  We therefore conclude that the superior court abused its discretion when it denied the attorney's request to call K.S. as part of the defense case.[21]

Given the nature of the rights at issue, the State must establish that the error is harmless beyond a reasonable doubt.[22]  Although a restriction on this type of questioning is often reversible error,[23] we conclude that, under the particular circumstances of this case, the error was harmless beyond a reasonable doubt.

K.S. had already testified during the trial, and the attorney's impeachment of her had not been limited in any way during her previous testimony.  In fact, he had

---

[20]  *See* Alaska R. Evid. 403; *Wilson v. State*, 680 P.2d 1173, 1178 (Alaska App. 1984) (affirming exclusion of defense witness testimony where there was no offer of proof indicating the content of the proposed testimony or how it would show bias, and where the testimony would cause confusion and delay).

[21]  *See Evans v. State*, 550 P.2d 830, 839-40 (Alaska 1976) (holding that the superior court erred in restricting the defendant's ability to fully cross-examine the witness for bias in favor of the State); *Wood v. State*, 837 P.2d 743, 747-49 (Alaska App. 1992) (holding that the superior court erred in refusing to permit the defendant to cross-examine the complaining witness to establish the witness's potential bias in favor of the State); *Jackson v. State*, 695 P.2d 227, 232 (Alaska App. 1985) (holding that the defendant's inability to fully cross-examine his co-defendant as to bias deprived the defendant of his right to confrontation).

[22]  *See Smithart v. State*, 988 P.2d 583, 586-92 (Alaska 1999) (recognizing that "a defendant's right to present a defense is a fundamental element of due process" and concluding that the trial court's errors in excluding the defendant's evidence and argument were not "harmless beyond a reasonable doubt"); *see also Evans*, 550 P.2d at 840 (recognizing that "when a criminal defendant is denied his constitutional right to confront and cross-examine his principal accuser," reversal is required unless the error was harmless beyond a reasonable doubt).

[23]  *See, e.g.*, *Evans*, 550 P.2d at 839-41; *Whitton v. State*, 479 P.2d 302, 316-18 (Alaska 1970); *Braund v. State*, 12 P.3d 187, 191-92 (Alaska App. 2000); *Wood*, 837 P.2d at 746-49.

been given three opportunities to ask her questions, and had elicited testimony about K.S.'s boyfriend that he later used (albeit unsuccessfully) to argue a theory of bias to the jury.

In contrast, the additional impeachment evidence Logan's attorney hoped to introduce by calling K.S. and questioning her about her unrelated felony charge was of marginal utility. As Logan's attorney acknowledged, K.S. was not charged with this felony until a year *after* the alleged sexual assault — *i.e.*, after the alleged sexual assault occurred, after K.S.'s report to the hospital and the police, and after K.S. testified to the grand jury. At trial, the jury heard K.S.'s testimony, which was consistent with her earlier reports and her previous grand jury testimony. And, as the State points out, if Logan's attorney had introduced evidence about K.S.'s recent felony charge, the State would have been entitled to present additional evidence of K.S.'s prior consistent statements to rebut the claim of recent fabrication.[24] The State also could have introduced evidence that an offer to resolve the pending felony had already been extended to K.S. There was therefore very little to support the claim that K.S.'s testimony at trial was influenced by her desire to curry favor with the State with regard to her own recent felony charge.

Lastly, we note that the purpose of establishing a witness's bias is to undermine their credibility. Although Logan's defense attorney challenged the credibility of some of K.S.'s testimony, he largely accepted that K.S. was incapacitated, and primarily argued that Logan had not been *aware* that she was incapacitated. In particular, Logan's attorney repeatedly told the jury during closing argument that the central question in the case was: "Did Mr. Logan understand . . . as he laid there in bed

---

[24] *See* Alaska R. Evid. 801(d)(1)(B) (allowing evidence of prior consistent statements to rebut a claim of "recent fabrication or improper influence or motive").

with [K.S.], as he put . . . his left hand inside [K.S.], that at that moment, she had no idea what was going on?"

Logan testified consistently with this defense — accepting that K.S. was asleep, but contending that he thought she was awake. Logan testified that he thought K.S. was awake, but then said, "I guess she wasn't awake." He stated, "I thought she was awake, but then she woke up again." And, finally, he testified, "I thought she was awake and then [I] . . . put my hand inside her vagina, and she woke up."

And ultimately, Logan's testimony was impeached by his own inculpatory statement to the police that he told K.S. he was trying to wake her up when he penetrated her.

Given this record and the strength of the State's case, we are persuaded that the court's error in precluding evidence of K.S.'s recent felony charge was harmless beyond a reasonable doubt. We therefore affirm Logan's conviction.

*Conclusion*

The judgment of the superior court is AFFIRMED.